761 A.2d 985

**SEABOARD SURETY COMPANY**

v.

**Ernest D. BONEY.**

**No. 2386, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

Nov. 6, 2000.

100

Cynthia E. Rodgers–Waire (Whiteford, Taylor & Preston, LLP, on the brief), Baltimore, for appellant.

Donald F. Chiarello (Hochberg, Chiarello & Costello, on the brief), Towson, for appellee.

Argued before WENNER,* THIEME and ADKINS, JJ.

ADKINS, Judge.

Both parties in this appeal are fellow victims of Lance O. Brown, a disbarred attorney who cross-breached his fiduciary duties to them. We must decide which one bears the risk of the losses caused by Brown's misconduct.

Seaboard Surety Company, appellant and cross-appellee, is the assignee of the guardianship estate of John W. Berger (the "Estate"). In his capacity as guardian of the Estate, Brown made an improper loan of $60,000 in Estate funds (the "Loan") to his client, Ernest D. Boney, appellee and cross-appellant. The purpose of the Berger Loan was to enable Boney to repurchase his house, which had been sold at foreclosure due to Brown's misconduct and legal malpractice. To obtain the Loan, Boney executed a promissory note and deed of trust in favor of the Estate (the "Note and Deed of Trust").

Brown's misdeeds were discovered shortly after the Loan. A substitute guardian replaced Brown and initiated foreclosure proceedings against Boney's house. In response, Boney filed a counterclaim seeking to cancel or modify the Note and Deed of Trust on the basis of Brown's fraud and malpractice. The Estate settled its claim against the guardianship bond issued by Seaboard, and then assigned its rights against Boney and Brown to Seaboard.

The Circuit Court for Anne Arundel County concluded there were grounds to cancel or modify the Note and Deed of Trust, citing Brown's fraud against Boney and Brown's capacity as guardian of the Estate at the time the Loan was made. After trial, the court entered an award of restitution in favor of Seaboard, but for an amount far less than the principal and interest due on the Note and Deed of Trust. As a result, Boney was excused from paying approximately $50,000 of the balance due under the Note, and Seaboard was left to seek

---

* Wenner, J., participated in the hearing and conference of this case while an active member of this Court; he participated in the adoption of this opinion as a retired, specially assigned member of this Court.

recovery of that difference from Brown, without any foreclosure rights or other security. We shall vacate the judgment, because we conclude that the risk of loss must fall on appellee Boney, as the principal of a fraudulent agent, and as the party who enabled his attorney's misconduct toward an innocent guardianship estate.

## FACTS AND LEGAL PROCEEDINGS

This case revolves around a regrettable web of ineptitude and fraud, at the center of which sits attorney Brown. Brown had a wealthy elderly client named John W. Berger. When Berger became incompetent, the Circuit Court for Baltimore City appointed Brown guardian of Berger's Estate, in April 1994. Appellant Seaboard issued a fiduciary bond to secure Brown's faithful performance of his duties as guardian of the Estate.

At the same time, one of Brown's clients was appellee Boney. Since 1992, Brown had been representing Boney in an effort to recover insurance proceeds alleged to be due as a result of a fire in a house that Boney owned as tenants by the entireties with his estranged wife, and in contemplated divorce proceedings. The fire insurer refused to cover the loss, alleging that Mrs. Boney had committed arson. Brown negotiated a settlement with the insurance company, which paid off the Boneys' $42,000 first mortgage. A second mortgage of approximately $11,000 remained.

Brown advised Boney to stop paying the second mortgage as part of a plan to eliminate Mrs. Boney's one half marital property interest in the house. By letting the second mortgage go to foreclosure, and then purchasing the house at the foreclosure sale through a straw purchaser, who then would reconvey the property to a newly formed corporation owned by Boney, Boney hoped to take the property "out of consideration" as marital property. Boney gave Brown $9,000 to hold toward a negotiated pay-off of the second mortgage. Boney also authorized Brown to find a lender for the additional money necessary to buy the house at foreclosure, believing

that the loan would be in Brown's name, and that he would reimburse Brown. To implement this plan, Boney stopped making second mortgage payments, and, through Brown, formed Arrow Housing Company to receive title from the straw purchaser.

The second mortgage holders foreclosed. At the foreclosure auction held in 1995 (the "First Foreclosure"), Brown was the high bidder, for $56,000, on behalf of Boney's sister, who was acting as the straw purchaser. The source of the funds that Brown presented to make the purchase was the Berger Estate. But the check that Brown presented bounced, due to insufficient funds. Nevertheless, Brown misled Boney to believe that everything was taken care of.

The Boney house was re-advertised, and a second foreclosure sale scheduled for April 3, 1996 (the "Second Foreclosure"). Brown did not tell Boney about the bounced check, re-advertisement, or second foreclosure sale. On the morning of the sale, Brown telephoned Boney, and told him to go to Annapolis to bid on his house. But by the time Boney got there, the house had been resold for $30,000 to bona fide purchasers, the Shapiros.

By this time, Boney was aware of Brown's failures in the First Foreclosure as well as in other legal matters that Brown handled for him. Brown reassured Boney that he would buy back the house, and "take care of the damage." In an attempt to do so, Brown negotiated to purchase the house back from the Shapiros for $65,518. Boney agreed to Brown's proposal to buy out the Shapiros.

At the June 14, 1996 settlement, Brown presented two checks totaling $60,000. Again, Brown improperly used funds from the Berger Estate as the source of those funds. This time, however, the checks did not bounce. Relying on Brown's promises to straighten everything out, and believing that Brown would reimburse him for any damages that he had caused, Boney signed the Note for $60,000 and the Deed of Trust. The Note required Boney to make 12 monthly payments of $660 (totaling $7,920) to the Estate, and to pay the

balance at the end of one year. But Brown led Boney to believe that he only had to make the 12 monthly payments, and that he would not be responsible for the balance. Boney believed that the total amount of his payments would be approximately the difference between the $9,000 that he had originally deposited with Brown to resolve the second mortgage and the amount necessary to buy the house back at the First Foreclosure Sale.

In accordance with the plan to eliminate Mrs. Boney's marital property interest, Arrow took title to the house. The settlement proceeds were used to pay off the second mortgage; pay title, attorney, and recording fees; repay the Shapiros' deposit; and pay the Shapiros a $20,000 premium. Although it had cost far more than the face amount of his first and second mortgages, Boney had his house back, free from his ex-wife's marital claims, albeit still fire damaged.

Brown's improper use of Estate funds to make the Loan came to light when an auditor appointed by the Baltimore City Circuit Court reported that Brown had misappropriated and misused Estate funds in various respects, including writing checks to himself; withdrawing Estate funds for personal use; making both the Loan and an unsecured $10,000 loan to an acquaintance; liquidating tax-free municipal bonds to purchase an $800,000 annuity for Berger, who was 91 at the time; and purchasing an investment condo for a price well above appraised value. The total amount of loss to the Estate exceeded $600,000.00. On September 6, 1996, the court removed Brown as Berger's guardian, for cause, and substituted Shawn R. Harby as guardian of the Estate.

Meanwhile, after making the first two monthly payments on the Note, Boney realized that Brown was not going to "straighten things out." When he stopped paying on the Note, Harby demanded payment. Boney made additional payments in February and March 1997, but none after that. Boney paid a total of approximately $3,900 on the Note.

In December 1996, Harby filed a claim against appellant Seaboard's guardian bond, in the Circuit Court for Baltimore

City. One year after the Loan, on June 13, 1997, Harby also initiated foreclosure proceedings against the Boney house under the Deed of Trust, in the Circuit Court for Anne Arundel County. The principal and interest due on the Note was $62,937.36. Boney counterclaimed, seeking to cancel or modify the Note and Deed of Trust as a result of Brown's fraud and legal malpractice. Boney also filed a third party complaint against Brown and a claim against the Client Security Trust Fund.

Brown filed for bankruptcy protection, thereby staying Boney's civil claims against him. On August 6, 1997, Brown pled guilty to theft and fraudulent misappropriation of fiduciary funds. Brown was imprisoned and disbarred as a result of his thefts from the Estate and from others.

On December 6, 1998, Mr. Berger died. Harby continued the Estate claims as personal representative of the Estate. The Estate's claim against Seaboard's guardian bond eventually settled for $544,995.26. This amount was equal to the Berger loss plus interest and expenses, minus net proceeds from sale of the investment condominium. As a result of the settlement, the Estate assigned to Seaboard all of its claims against Brown and Boney.

At the bench trial on Boney's counterclaim for cancellation and modification of the Note and Deed of Trust, the parties stipulated facts and submitted other documentary evidence. The circuit court rendered its decision orally from the bench, finding that Boney

> was the victim of fraud and legal malpractice by his attorney, Mr. Brown. He signed a note and a deed of trust for $60,000 and he did not receive $60,000. However, the second mortgage which he did owe ... was satisfied and paid off in the course of this proceeding.

> The [c]ourt finds that as a result of the fraud by Mr. Brown, who was at the time the substitute guardian of the property for John Berger as well as also being the attorney at law on behalf of Ernest Boney in June of 1996, that

equity requires that there be cancellation or modification of those instruments: the note and the deed of trust.

Seaboard's counsel objected that canceling or modifying the Note and Deed of Trust "unjustly enriche[d] Mr. Boney, given the amount of funds that were paid off on his behalf." When she requested that the court "explain [its] reasoning with regard to Mr. Brown's fraud being imputed to my client," the court replied that the fact that Brown was acting in his capacity as guardian of the Estate at the time of the Loan "weigh[ed] heavily in this decision."

Modifying the Note, the court entered judgment on the counterclaim in favor of Seaboard for $9,589.70, which is the difference between the amount Boney owed on the second mortgage on the date of the Second Foreclosure sale ($22,489.70), minus the amount Boney delivered to Brown to pay toward the second mortgage ($9,000), minus the amount of Boney's payments on the Note ($3,900). Both parties were dissatisfied with the amount of the judgment. When Seaboard appealed, Boney cross-appealed.

## DISCUSSION

### Standard Of Review

In an action tried without a jury, we "will review the case on both the law and the evidence." Md.Rule 8–131(c). When the issue to which appellant excepts, and on which the court ruled, is a purely legal issue, there being no dispute of fact, the appellate court's review is expansive. *See In re Michael G.*, 107 Md.App. 257, 265, 667 A.2d 956 (1995). "The clearly erroneous standard for appellate review ... does not apply to a trial court's determinations of legal questions or conclusions of law based on findings of fact." *See Heat & Power Corp. v. Air Prods. & Chems., Inc.*, 320 Md. 584, 591, 578 A.2d 1202 (1990). In such cases, we must determine whether the trial court was "legally correct." *See id.* at 592, 578 A.2d 1202.

## Seaboard's Appeal: Who Bears The Risk Of Losses Caused By A Guardian–Attorney's Cross–Breaches Of Fiduciary Duty?

When asked why Seaboard, rather than Boney, should be charged with the losses caused by Brown's misconduct, the court explained that Brown's status as guardian of the Estate "weigh[ed] heavily in this decision." In its appeal, Seaboard argues that the court erred when it relieved Boney from Brown's fraud at its expense. It contends that neither the Estate nor Seaboard, as its assignee, should be held responsible for the malpractice Brown committed as Boney's attorney simply because Brown attempted to remedy that malpractice by cross-breaching his fiduciary duty to the Estate. In response, Boney contends that the trial court properly relieved Boney from the losses caused by Brown's misconduct, because those losses were covered by Seaboard under its guardianship bond.

■ The issue before us, then, is whether the circuit court erred in concluding that Boney could assert Brown's fraud and misconduct as a defense to the Note and Deed of Trust. Essentially, we must determine whether Brown's role as guardian of the Estate when he made the improper Loan and Seaboard's role as surety under the guardian bond insulated Boney from the consequences of his attorney's misconduct. We hold that the trial court erred in modifying the Note on the basis of Brown's fraud, and in treating Brown's status as guardian of the Estate or Seaboard's guardianship bond as grounds to do so. Applying established principles of agency, estoppel, guardianship, suretyship, and subrogation to the undisputed facts of this case, we conclude that, as between Seaboard and Boney, it is Boney who must bear the risk of losses caused by his attorney's misconduct.

### A.

### Agency v. Guardianship

■ Brown and appellee had an attorney-client relationship. That relationship was not only a fiduciary one, it was

also an agent-principal relationship. *See, e.g., Advance Fin. Co. v. Clients' Security Trust Fund,* 337 Md. 195, 201, 652 A.2d 660 (1995)("agents are lawyers whose principals are clients"); *Henley v. Prince George's County,* 305 Md. 320, 340, n. 5, 503 A.2d 1333, *aff'd in part and rev'd in part on other grounds,* 305 Md. 320, 503 A.2d 1333 (1986) ("[i]ndependent contractors generally considered to be agents include attorneys ... and other similar persons who conduct transactions for their principal"). Because agents have the power to alter the legal relations of their principals, principals have the right to control their agents. *See Green v. H & R Block,* 355 Md. 488, 503–04, 735 A.2d 1039 (1999). A client's right to select and direct his or her attorney is a fundamental aspect of attorney-client relations. Thus, the principal-agent relationship between a client and an attorney is always a consensual one. *See Restatement (Second) of Agency,* § 1(1) cmt. b; *id.* at § 401 cmt. a (1958).

In contrast, the relationship between Brown and the Estate was an involuntary guardianship relationship. A ward may not select, instruct, terminate, or otherwise control his guardian. *See* Md.Code (1974, 1991 Repl.Vol., 2000 Cum. Supp.), § 13 201(c) of the Estates and Trusts Article ("ET") (guardian substitutes its discretion and judgment for that of incompetent ward); ET § 13–221 (guardian removable only by court order). A guardian is a fiduciary who has control over the ward's property, subject to court supervision, and is charged with preserving it "from being squandered or improvidently used." *Restatement (Second) of Contracts,* § 13 cmt. a (1981). A guardian must "utilize his powers ... to perform the services, exercise his discretion, and discharge his duties for the best interest of the ... disabled person or his dependents." ET § 13–206(c). Thus, the fundamental duty of a guardian of property is to preserve the property in the guardianship estate for the benefit of the ward and other persons with an interest in that property. To ensure the faithful performance of that duty, the guardian must post a judicial bond covering the value of the property in the fiduciary estate. *See* Md.Rule 10–702(d).

Guardians are not agents of either their wards or the bonding surety, because guardians are not subject to their control. *See Restatement (Second) of Agency,* § 14F cmt. b. Rather, the Court of Appeals has emphasized that the true guardian of every guardianship estate is the court itself, and that individuals who are appointed as guardians serve a unique role as agents of the court.

> Lest sight be lost of the fact, we remind all concerned that a court of equity assumes jurisdiction in guardianship matters to protect those who, because of illness or other disability, are unable to care for themselves. **In reality the court is the guardian; an individual who is given that title is merely an agent or arm of that tribunal in carrying out its sacred responsibility.**

*Kicherer v. Kicherer,* 285 Md. 114, 118, 400 A.2d 1097 (1979) (emphasis added).

## B.

### Equitable Estoppel By Agency

Seaboard argues that the difference in the natures of Brown's relationships with Boney and with the Estate is outcome determinative, because Boney is legally responsible for Brown's misconduct under established principles of agency law. We agree, and explain.

A fundamental tenet of agency law is that a principal may be bound by even the wrongful acts of his agent. "The fact that the agent has wronged his principal through the agent's unlawful act does not provide a predicate for insulating the principal against the harm caused by the agent at the expense of the innocent third party who had no responsibility for the conduct of the agent." *Rothman v. Fillette,* 503 Pa. 259, 469 A.2d 543, 546 (1983); *see also Coan v. Consol. Gas Elec. Light & Power Co.,* 126 Md. 506, 511, 95 A. 151 (1915) (principal could not assert agent's fraud as defense to third party's claim for rescission of contract). This case falls within the parameters of the ancient maxim that " 'when one of two innocent persons must suffer by the fraud of a third, the loss

shall fall upon him, who has enabled such third person to do the wrong.'" *Hall v. Hinks,* 21 Md. 406, 418 (1864) (quoting *Lupin v. Marie,* 2 Paige Rep. 169, 172, 1830 WL 2732).

 This aspect of agency is enforced through equitable estoppel, which has the effect of shifting to the principal the risk of loss arising from the agent's fraud toward an innocent third party. *In Chevy Chase Bank, F.S.B. v. Chaires,* 350 Md. 716, 715 A.2d 199 (1998), the Court of Appeals recently affirmed that a principal is equitably estopped from asserting his agent's fraud as a defense against an innocent third party.

> [E]quitable estoppel [is] 'the effect of the voluntary conduct of a party whereby he is absolutely precluded both at law and in equity, from asserting rights which might perhaps have otherwise existed ... as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse and who on his part requires some corresponding right. . . .' [Pomeroy] describes the general principle underlying estoppel *in pais* as loss-shifting. Pomeroy states, 'When one of two innocent persons—that is, persons each guiltless of an intentional, moral wrong—must suffer a loss, it must be borne by that one of them who by his conduct—acts or omissions—has rendered the injury possible. . . .' '[A]n estoppel may arise even where there is no intent to mislead, if the actions of one party cause a prejudicial change in the conduct of the other.' Indeed, all that is needed to create an equitable estoppel is (1) voluntary conduct or representation, (2) reliance, and (3) detriment.'

350 Md. at 737–38, 715 A.2d 199 (citations omitted). Whether the undisputed facts establish equitable estoppel is a question of law for the court. *See id.* at 744, 715 A.2d 199.

 Our review of the undisputed facts leads us to conclude that Boney cannot profit by the misconduct of his agent against the innocent guardianship Estate, who had no control over or responsibility for Brown's performance of his duties either as Boney's agent or as guardian. Boney was

estopped from asserting Brown's fraud as a defense to the Note and Deed of Trust, because Boney enabled Brown's misconduct, even if he did not intend to do so. Among such "enabling acts" was Boney's decision to entrust both his money and his cause to Brown, even after Boney realized that Brown had mishandled the First Foreclosure and other legal matters that Boney entrusted to him, and even after Boney knew that Brown had compounded his incompetence and errors by covering them up. "[I]f a loss occurs by which one of two innocent persons must suffer, that one should sustain the loss who has most trusted the party through whom the loss came." *Eversole v. Maull,* 50 Md. 95, 106 (1878); *see also Thomas v. Green,* 30 Md. 1, 7 (1869) ("[f]or wherever one of two innocent persons must suffer from a false confidence or trust reposed in a third, he who has been the cause of that false confidence or trust, ought to suffer, rather than the other").

 Boney further enabled Brown's misconduct by failing to exercise diligence, or to take advantage of opportunities to become informed about the transactions Brown was handling for him.[1] Principals must pay attention to what their agents are doing on their behalf, and they fail to do so at their own risk.[2] Boney agreed to participate in the ill-advised foreclosure scheme and accepted the Loan based solely on Brown's vague verbal assurances that he would "straighten things out" and "take care of the damage." He might have avoided the Loan by making his second mortgage payments, or by declining to participate in the multi-layered foreclosure scheme, by arranging for his own loan, by firing Brown, or by declining to

---

1. *See, e.g., Fed. Intermediate Credit Bank v. Mitchell,* 46 F.2d 301, 302 (4th Cir.1931) (principal enabled agent's defalcation by failing to make inquiry about collection activities of agent, despite superior opportunity to do so).

2. *Cf. Restatement (Second) of Contracts,* § 154(b) cmt. c (1981) (party cannot avoid contract based upon his "conscious ignorance" when it is aware, at the time the contract is made, that it had only limited knowledge with respect to the facts to which the mistake relates but treats its limited knowledge as sufficient).

sign the Note and Deed of Trust. He could have sought independent legal or financial advice at any time.

The Loan occurred as a direct result of Brown's desperate efforts to extricate himself from the consequences of his fraud and legal malpractice toward Boney. The undisputed evidence clearly establishes that but for Brown's misconduct toward Boney in handling Boney's legal matters, Brown would not have made the Loan. But for Boney's willingness to go along with Brown's plans and to accept the Loan on the slender reed of Brown's reassurances, the Estate's funds would not have been loaned. Thus, the misconduct that Brown committed in his capacity as Boney's agent proximately caused the Loan. As Brown's principal, Boney cannot profit by the misconduct of his agent against an innocent third party such as the Estate, who had no control over or responsibility for Brown's performance of his duties either as Boney's agent or as guardian. As between the Estate and Boney, it is Boney who is responsible for the Loan he accepted, and who is equitably estopped from challenging the Note and Deed of Trust.

## C.

### Effect Of Brown's Role As Guardian Of The Estate And Seaboard's Role As Surety Of The Guardianship Bond

Boney argues that the circuit court properly considered Brown's role as guardian of the Estate as grounds for shifting the losses caused by Brown to Seaboard. He argues that Seaboard should bear the loss because Brown breached his fiduciary duty to the Estate when he made the Loan, and because Seaboard bonded Brown's faithful performance of his duties as guardian. He complains that "justice to Boney would be sacrificed because of the mere technicality that Brown is deemed an 'agent' for Boney, and a 'trustee' for Berger." We disagree. As discussed below, neither Brown's role as guardian of the Estate nor Seaboard's role as surety

on the guardianship bond relieves Boney from the principles of agency and estoppel that govern this case.

First, we do not agree with Boney's contention that Brown's status as a guardian was a "mere technicality" or a "superceding" reason to shift the risk of loss to Seaboard. To the contrary, it actually provides more reason that the risk should remain on Boney. The duty of the courts to protect beneficiaries of a guardianship includes a duty to protect against the harmful consequences of fraud. In *Green v. Lombard*, 28 Md.App. 1, 343 A.2d 905 (1975), this Court considered a guardian's fraudulent use of estate funds to make improper loans. We emphasized that the rule that fraud "taints and vitiates all that it touches . . . . is especially true when the victim occupies a position of confidence and trust with the perpetrator of the fraud and is either an aged [or] infirm person. . . ." *Id.* at 12, 343 A.2d 905. We think this rule and its underlying concerns for the welfare of the ward are even stronger when, as in this case, the fraud is committed by an attorney acting in dual roles as both guardian of the estate from which an improper loan is made, and as attorney for the client who receives the improper loan.

This result is consistent with Maryland law governing persons dealing with guardians. A borrower with actual knowledge or reasonable cause to inquire whether the guardian is acting improperly in making a loan from estate funds bears the risk that the loan is improper.[3] *See* ET § 13–219. In this case, Boney, as borrower, properly bears that risk, because when he signed the Note and Deed of Trust, he

---

**3.** Our analysis assumes that Boney knew Brown was the guardian of the Estate. Although it is not clear from the record before us whether Boney had actual knowledge of the guardianship, he is chargeable with such knowledge, because "guardianship proceedings are treated as giving public notice of the ward's incapacity and establish his status with respect to transactions during guardianship even though the other party to a particular transaction may have no knowledge or reason to know of the guardianship. . . ." *Restatement (Second) of Contracts*, § 13 cmt. a. Waiving this rule would invite a "head in the sand" approach, or create an exception that would "swallow the rule" and undermine the protective purpose of guardianships.

had reason to inquire whether the Loan was proper.[4] It is undisputed that, before he agreed to accept the Loan, Boney knew that Brown had mishandled the First Foreclosure and other legal matters. Thus, he had reason to know that the Loan would personally benefit Brown by "straightening out" the problems and losses that Brown had caused him. In these circumstances, Boney fairly may be held responsible for his decision to accept the Loan and to execute the Note and Deed of Trust "with no questions asked" about its propriety. *See, e.g., Trenton Trust Co. v. Western Surety Co.*, 599 S.W.2d 481, 493–94 (Mo.1980) (when party to a transaction has reason to suspect that guardian has misappropriated estate assets for guardian's own benefit, party has reason to know that transaction was in breach of guardian's fiduciary duty, and acts in bad faith).

Furthermore, we are not persuaded that Seaboard must bear Boney's risk of loss merely because it bonded Brown as guardian of the Estate. First, we do not think that *National Surety Co. v. State to the use of Morgan*, 152 Md. 71, 136 A. 274 (1927), stands for the proposition advanced by Boney: that Seaboard's bond was intended to cover losses to third parties harmed by the wrongful actions of the guardian in the course of their dealings with him. Instead, that case addressed whether the assignee of a mortgagee could make a claim against a bond securing the faithful execution of a trustee's duty under a mortgage. The Court of Appeals held that under a mortgage trustee's bond, the surety had a duty to the mortgagee and its assignee, because "the principal purpose of such a bond, and indeed the only reason for it, is to protect those who may be interested in the trust fund from just such acts [of misappropriation]." *Id.* at 75, 136 A. 274.

---

4. We note that third parties dealing with a guardianship estate through its court-appointed guardian always may seek the protection of the court with respect to proposed transactions that raise a potential for conflict of interest. *See, e.g., Krider v. Bryant–Banks*, 682 So.2d 876, 880 (La.App.1996), *cert. denied*, 686 So.2d 864 (1997) (third parties dealing with guardian of minor without a judicial order confirming guardian's actions "do so at their risk").

That holding simply recognizes that mortgagees are "persons interested in such mortgaged property or the proceeds thereof." *Employers' Liab. Assur. Corp. v. State,* 163 Md. 119, 133, 161 A. 249 (1932).

Thus, *Morgan* merely affirmed that a mortgagee is an intended beneficiary of a mortgage bond. It did not extend the protections of all bonds to persons who have no claim to or interest in the property that the bonded fiduciary is charged with protecting. In *State to use of Murray v. Bishop,* 24 Md. 310, 320 (1866), the Court of Appeals recognized that "[t]he object of the guardian's bond is to secure the ward against illegal disposition of his property by the guardian, or its maladministration...." Third parties who may have been harmed by the guardian's wrongful actions "might be entitled to their action against [the guardian], to recover [damages resulting from his misconduct], but they have no right of action on the guardian's bond...." *Id.* at 322. Thus, we reject Boney's contention that the protections of a guardian bond extend to members of the public who deal with the guardian, but who otherwise have no cognizable rights in or claim to the guardianship property.

A guardian's bond is a court fiduciary bond that is legally mandated as an important means of protecting guardianship property. *See Restatement (Third) of Suretyship and Guaranty,* § 71 cmt. d (1996). Its purpose is not to provide security for otherwise disinterested third parties who deal with the guardian. This limitation on the purpose and beneficiaries of a guardian bond is reflected in the language required under Maryland rules, and used in Seaboard's bond. *See* Md.Rule 10–702(e). The bond states that both Brown "as Principal" and Seaboard as "Surety,"

> are held and firmly bound unto the State of Maryland, in the full and just sum of ... $1,250,000.00, to be paid to the State of Maryland aforesaid; to which payment, well and truly made and done, [they] bind [them]selves.... Now the Condition of the above Obligation is such, that if ... Brown as Guardian ... shall faithfully account with the Orphans'

Court of Baltimore City, as directed by law for the management of the property and Estate of the Incompetent under care, and shall also deliver up the said property; agreeably to the order of said Court, or the directions of law, and shall, in all respects, perform the duty of Guardian to the said Incompetent according to law, then the above obligation shall cease; it shall otherwise remain in full force and virtue in law.

This limitation on the scope of a guardian bond promotes the purpose of guardianship proceedings, not only by protecting guardianship property, but also by promoting the guardian's faithful performance of fiduciary duties. Under established principles governing fiduciary relations, the risk of financial losses caused by a fiduciary's misconduct remains on the fiduciary as an incentive for the fiduciary to faithfully perform. It has long been held that the fiduciary estate itself is not liable for its fiduciary's misconduct toward others.

'It seems to have been thought, that if [fiduciaries] are guilty of a breach of [fiduciary duty], the persons damnified thereby have a right to be indemnified out of the [fiduciary] funds. That is contrary to all reason and justice and common sense. Such a perversion of the intention of the [person creating the fiduciary estate] would lead to the most inconvenient consequences. The [fiduciaries] would, in that case, be indemnified against the consequences of their own misconduct, and the real object of the [fiduciary estate] would be defeated. * * * Damages are to be paid from the pocket of the wrong-doer, not from the [fiduciary] fund.'

*Perry v. House of Refuge*, 63 Md. 20, 27 (1885) (quoting Lord Campbell regarding charitable trusts). Thus, third parties seeking redress for a guardian's wrongful acts must look directly to the guardian.

We do not think that the addition of a guardian bond shifts the risk of loss away from the guardian. Once a surety makes the guardianship estate whole in accordance with the terms of a guardian bond, the surety is subrogated to the rights of the guardianship estate, and may recover from

the guardian any amounts paid to the estate under the bond. In addition, the surety may assert any claims that the guardianship estate may have had against collateral and any defenses that the estate may have had against third parties who dealt with the guardian. *See generally Restatement (Third) of Suretyship and Guaranty,* § 28 (rights obtained through subrogation).

We are not persuaded that the rule should be different in cases involving an attorney-guardian. Expanding a surety's liability under a guardian bond to cover losses caused by an attorney-guardian's misconduct to third parties effectively would convert the guardian bond into legal malpractice insurance, and may impose undue burdens on the guardianship estate. We find merit in Seaboard's contention that if fiduciary bonds are construed to cover the consequences of an attorney-fiduciary's wrongful use of his fiduciary position to "cover up" unrelated malpractice, sureties would be less likely to issue fiduciary bonds for attorneys at the same rate or frequency as for fiduciaries who are not attorneys. Fiduciary bond premiums are significantly less expensive than legal malpractice insurance. Sureties understandably would raise fiduciary bond premiums if the selection of an attorney as the fiduciary would increase the liability risk. Courts would be more reluctant to appoint attorneys if doing so imposes an additional expense on the estate, and more reluctant to excuse bonds for attorney-fiduciaries if doing so exposes the estate to third party damages. Thus, courts and fiduciary beneficiaries would be either discouraged from or financially penalized by selecting an attorney as fiduciary.

The anomalous result would be fewer attorneys serving as guardians, trustees, personal representatives, or other fiduciaries, even though sureties traditionally have preferred attorneys as fiduciaries because their fiduciary experience generally decreases the risk of misconduct. Moreover, as officers of the appointing court, attorneys must adhere to established rules of professional conduct, including specific rules governing handling of third party money. They have fiduciary duties to all clients, in addition to their fiduciary duties to the estate.

Attorneys also have a unique motivation to avoid breaching their fiduciary duties, because doing so may result in disbarment or other disciplinary measures, and may damage their reputation and livelihood. Indeed, we recognize that in estates with no fiduciary bond, the nature of the attorney-fiduciary's relationship with the court can serve as an important protection for the fiduciary estate and its beneficiaries.

We hold that the trial court erred in modifying the Note and Deed of Trust on the basis of Brown's status as guardian or Seaboard's guardianship bond. Our decision in Seaboard's appeal moots Boney's cross-appeal and Seaboard's alternative contentions regarding the amount of the restitutionary judgment. We shall vacate the judgment of the circuit court, and remand with instructions to enter judgment denying Boney's counterclaim for rescission, cancellation, or modification of the Note and Deed of Trust. As the subrogee and assignee of the Estate, Seaboard is entitled to pursue payment and foreclosure rights under the Note and Deed of Trust.

**JUDGMENT REVERSED. CASE REMANDED TO CIRCUIT COURT WITH INSTRUCTIONS TO ENTER JUDGMENT FOR APPELLANT ON APPELLEE'S COUNTERCLAIM, AND FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.**