**NATIONAL GRANGE MUTUAL INSURANCE COMPANY,**
**Plaintiff**

v.

**VERIZON'S BENEFITS CENTER,**
**et al., Defendants.**

**Civil No. L–06–543.**

United States District Court,
D. Maryland.

March 27, 2008.

Dawn C. Stewart, Stewart and Henry PLLC, Fairfax, VA, for Plaintiff.

Robert Ross Niccolini, McGuirewoods LLP, Baltimore, MD, David F. Dabbs, McGuirewoods LLP, Richmond, VA, Barry Bach, Lisa Y. Settles, Hodes Ulman Pessin and Katz PA, Towson, MD, for Defendants.

## MEMORANDUM

BENSON EVERETT LEGG, Chief Judge.

Now pending are the Cross–Motions for Summary Judgment filed by Plaintiff National Grange Mutual Insurance Company ("National Grange") and Defendant Atlantic Financial Federal Credit Union ("Atlantic"). Because the issues are adequate-

ly addressed in the briefs, no hearing is necessary. *See* Local Rule 105.6 (D.Md. 2008). For the following reasons, the Court will, by separate Order, DENY National Grange's Motion (Docket No. 34) and GRANT Atlantic's Motion (Docket No. 35).

This is a bank negligence case. National Grange, as assignee of the rights of Stacie Norris, a minor, claims that Atlantic should have prevented Defendant Saundra Norris, Stacie's guardian, from misappropriating funds in Saundra's bank accounts that were part of Stacie's guardianship estate. The resolution of this case is dictated by the general rule that a bank, with certain narrow exceptions, owes no duty to a non-customer with whom it has no direct relationship. Stacie was not a customer of the bank and the narrow exceptions do not apply to the facts of this case. Moreover, as will be discussed, Atlantic neither knew nor had reason to know the nature of the funds in Saundra's accounts, and Atlantic acted in accordance with acceptable banking practices. Accordingly, Atlantic owed Stacie no duty of care and is not liable to National Grange, the assignee of Stacie's rights.

## I. Background

The facts of this case are largely undisputed. When Frank Norris died, a death benefit of $32,000 became payable to his daughter, Stacie Norris, under his pension with Verizon Communications Inc. On December 26, 2001, the Orphans' Court appointed Saundra Norris as guardian of Stacie's property. The Orphans' Court required Saundra (i) to post a bond in the value of the death benefit, and (ii) to deposit the benefit at a FDIC insured bank in an account titled "Saundra Norris, Guardian of the Property of Stacie Norris, a minor, subject to the Order of the Orphans' Court of Baltimore County." Saundra posted a bond, naming National Grange as the surety.

Verizon paid out Stacie's benefit by issuing a check for $29,331.72 payable to "Saundra Norris bene of Frank E. Norris."[1] On August 14, 2002, contrary to the Orphans' Court's order, Saundra deposited the $29,331.72 into three separate accounts she held at Atlantic in her name. She deposited $2,000 into her personal checking account, $15,331.72 into an unrestricted money market account, and $12,000 into a one-year share certificate (the "Share Certificate"). The Share Certificate was titled in Saundra's name, with Stacie as the beneficiary.[2] Almost immediately after depositing the check from Verizon, Saundra began withdrawing funds from the money market account.

On August 30, 2002, Saundra asked Bonnie Mascaro, the manager of Atlantic's Hunt Valley, Maryland, branch, to write a letter to the Orphans' Court. The letter stated that Saundra held the Share Certificate in her name with Stacie as the beneficiary.

On September 17, 2002, a person named Billie Zimmer wrote a memorandum to the Orphans' Court discussing Saundra's guardianship. The memorandum explains that the accounts that held the guardianship funds were neither properly titled nor properly insured. Zimmer also informed the Orphans' Court that, just that day, she called Mascaro to inquire about Saundra's account. According to the memorandum, Mascaro told Zimmer: (i) that Saundra

---

1. Verizon claims that the check was properly payable to Saundra because she was a "relative or other proper person," under its benefits plan and could be paid Stacie's benefits. The amount of $29,331.72 represented the full $32,000 benefit owed to Stacie, less taxes.

2. The term "beneficiary" meant only that the balance of the Share Certificate would be paid out to Stacie if Saundra were to die before the Share Certificate became due.

had a one year Share Certificate in Saundra's name with Stacie named as the beneficiary, (ii) that the Share Certificate was insured but not by the FDIC, and (iii) that the Share Certificate could not be re-titled without a penalty before it matured on August 14, 2003. Zimmer concluded the memorandum by asking the Orphans' Court how it wished to proceed.

By October 21, 2002, Saundra had withdrawn all $15,331.72 from the money market account. On January 15, 2003, the Orphans' Court terminated Saundra's guardianship because she had failed to properly account for the guardianship funds. On January 29, 2003 the Orphans' Court appointed a successor guardian, Charles H. Hobbs IV.

On January 31, 2003 Hobbs wrote a letter to Mascaro, stating that the Orphans' Court had named him substitute guardian. Hobbs's letter went on to request that he be allowed to withdraw funds from the Share Certificate. Hobbs attached the Orphans' Court's order appointing him substitute guardian but did not attach the Orphans' Court's original order that appointed Saundra as Stacie's guardian. Mascaro and Hobbs met in February 2003 at Atlantic's Hunt Valley Branch. Mascaro refused to allow Hobbs to remove the funds from the Share Certificate, stating that she had no proof that those funds were related to Stacie's guardianship.

On August 14, 2003, the Share Certificate matured. Saundra began withdrawing funds from the Share Certificate on August 15, 2003. By October 25, 2003, Saundra had withdrawn all $12,000.

On July 14, 2004, Hobbs petitioned a Maryland State Court to order National Grange to pay him $24,584.72 under the surety bond it had issued to Saundra.[3] National Grange agreed to pay out the bond, and in exchange, Hobbs assigned to National Grange the guardianship's causes of action. National Grange brought this suit against Saundra, Verizon, and Atlantic in the Circuit Court for Baltimore County, Maryland. National Grange's complaint alleged three counts: (i) negligence (against Verizon and Atlantic), (ii) breach of contract (against Verizon and Atlantic), and (iii) conversion (against Saundra). On March 1, 2006, Verizon removed the action to this Court.[4]

On April 3, 2006, Atlantic filed an answer, which included a cross-claim against Saundra. On July 18, 2006, Saundra was served with process. On August 4, 2006, Atlantic filed a cross-claim against Verizon. On August 14, 2006, National Grange moved for an entry of default and a default judgment against Saundra. On August 18, 2006, Verizon moved for judgment on Atlantic's cross-claim.

On March 5, 2007, the Court held a teleconference. The Court concluded it would be most efficient to first resolve National Grange's claim against Atlantic. Accordingly, the Court denied the motions of Verizon and National Grange without prejudice and ordered limited discovery regarding National Grange's claim against Atlantic, to be followed by the filing of dispositive motions. Following discovery, both Atlantic and National Grange moved for Summary Judgment.

## II. Standard of Review

The Court may grant summary judgment when "the pleadings, depositions, an-

---

3. Hobbs concluded that Saundra had used $4,747.00 of the $29,331.72 for the benefit of Stacie. Accordingly, Hobbs determined the loss to Stacie's estate to be $24,584.72.

4. Verizon removed the case based on federal question jurisdiction, claiming that the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et seq.* ("ERISA") preempted National Grange's negligence claim against Verizon.

swers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987) (recognizing that trial judges have "an affirmative obligation" to prevent factually unsupported claims and defenses from proceeding to trial). Nevertheless, in determining whether there is a genuine issue of material fact, the Court views the facts, and all reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. *Pulliam Inv. Co. v. Cameo Properties,* 810 F.2d 1282, 1286 (4th Cir.1987).

When both parties file motions for summary judgment the Court applies this same standard of review. *See McCready v. Standard Ins. Co.,* 417 F.Supp.2d 684, 695 (D.Md.2006) (citing *Taft Broad. Co. v. United States,* 929 F.2d 240, 248 (6th Cir. 1991)). The Court considers each motion "separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar,* 316 F.3d 516, 523 (4th Cir. 2003).

## III. Applicable Law

Atlantic's brief correctly outlines the applicable law.[5] There are two principles at

work in this case: (i) the duty that a bank owes to a non-customer in tort and (ii) the liability of a third-party dealing with a guardian or other fiduciary.[6] The Court will address each in turn.

### A. Duty of a Bank to a Non–Customer

To establish negligence under Maryland law,[7] the plaintiff must prove (1) a duty owed to him, (2) a breach of that duty, (3) a legally cognizable causal relationship between the breach of duty and the harm suffered, and (4) damages. *Jacques v. First Nat'l Bank of Maryland,* 307 Md. 527, 531, 515 A.2d 756, 758 (1986). The focus of this case is whether Atlantic owed Stacie's estate a duty.

Under Maryland law, when only economic harms are alleged, the plaintiff must show an "intimate nexus" with the defendant to establish a duty. *Chicago Title Ins. Co. v. Allfirst Bank,* 394 Md. 270, 291, 905 A.2d 366, 378 (2006). The plaintiff must show that he was in "privity or its equivalent" with the defendant to establish an intimate nexus. *Chicago Title,* 905 A.2d at 378.

A well-established rule is that a bank, with certain narrow exceptions, does not owe a duty to a non-customer with whom it has no direct relationship. *See Nat'l Union Fire Ins. Co. v. Allfirst Bank,* 282 F.Supp.2d 339, 345 (D.Md.2003) *citing Eisenberg v. Wachovia Bank,* 301 F.3d 220, 225 (4th Cir.2002) (construing North Carolina law). The Fourth Circuit case of

---

**5.** In its briefing, National Grange concedes that Atlantic is entitled to summary judgment on National Grange's breach of contract claim. (*See* Pl. Mot. in Opp'n at 3.) Accordingly, the Court will only address National Grange's negligence claim.

**6.** The Court finds *Seaboard Surety v. Boney,* 135 Md.App. 99, 761 A.2d 985 (2000), which National Grange cites extensively, inapposite

as it is not a negligence case and does not address the duties a bank owes a non-customer in tort.

**7.** Because Atlantic's allegedly negligent actions all occurred in Maryland, the Court will apply Maryland law to National Grange's state law negligence claim. *See Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

*Eisenberg v. Wachovia* is instructive on this point. In *Eisenberg,* Wachovia Bank allowed a man to open an account in his name "doing business as" Bear Stearns Companies and did nothing to verify that the man had a relationship with Bear Stearns. 301 F.3d at 223–224. The man used the bank account to defraud Eisenberg. *Id.* at 224. The Court held that Wachovia did not owe Eisenberg a duty of care because he was not a Wachovia customer. *Id.* at 227.

Based on an unusual set of facts, the Maryland Court of Appeals created a narrow exception to this general rule in *Chicago Title.*[8] The plaintiff was a title company that wanted to clear all liens on Mark Shanahan's house as part of a refinancing. *Chicago Title,* 905 A.2d at 369–370. The defendant bank had taken a lien on Shanahan's house to secure a loan. *Id.* To clear the lien, the title company gave Shanahan an explanatory letter to give to the bank together with a check made payable to the bank. The letter explained that the title company, who was not a customer of the bank, intended the bank to apply the funds to Shanahan's outstanding loan and to remove the bank's lien on Shanahan's property. *Id.* at 382. Shanahan presented the check, but not the letter, to the bank. The bank, for reasons unknown, signed the check over to Shanahan. *Id.* Later, when Shanahan defaulted on his line of credit with the bank, the bank foreclosed on his house. *Id.*

Although recognizing the general rule, the Court found that the bank was liable to the title company in tort. The Court con-

cluded that the bank owed a duty to the title company because (i) the title company made the check payable to the bank, (ii) the bank violated accepted banking practices by signing over the check to Shanahan without seeking instructions from the title company, and (iii) the bank knew, from prior dealings, that the title company was attempting to remove all liens on Shanahan's house. *Chicago Title,* 905 A.2d at 382.

## B. Liability of a Third–Party Dealing with a Guardian

■ Two Maryland statutes also serve to limit liability when a third party deals with a guardian or a fiduciary, respectively. First, a person dealing with a guardian in Maryland is entitled to assume that the guardian is acting within the scope of his guardianship, unless he has actual knowledge or reason to inquire whether the guardian is improperly exercising his power. Md.Code Ann. Est. & Trusts § 13–219 (2007).

■ More generally, under the Uniform Fiduciary Act, which Maryland has adopted, if a fiduciary deposits trust funds into a personal account at a bank, the bank is not required to inquire whether the deposit is proper. Md.Code Ann. Est. & Trusts § 15–208. The bank can only be liable if it knows that the fiduciary is violating his duty, or acts in bad faith, not if it is merely negligent. *See E.F. Hutton Mortgage, Corp. v. Equitable Bank, N.A.,* 678 F.Supp. 567, 584 (D.Md.1988).[9]

---

8. *Chicago Title* is the only Maryland case that deviates from the general rule that a bank does not owe a duty to a non-customer with whom it has no direct relationship.

9. Cases in other jurisdictions are instructive as to the level of knowledge that a bank must have for it to be liable for allowing a fiduciary to breach his duty. A Missouri Court held

that a bank was liable to a guardianship when it accepted what it knew to be guardianship funds as collateral for a personal loan to the guardian. *Trenton Trust Co. v. Western Surety Co.,* 599 S.W.2d 481, 493 (Mo.1980). The Court explained that a bank acts with bad faith when it benefits from a transaction that it has reason to believe involves a breach of the guardian's fiduciary duty. *Id.*

## IV. Analysis

Under either applicable principle, Atlantic is not liable to National Grange. At no point was Atlantic in "privity or its equivalent" with Stacie. Furthermore, at no point was Atlantic on sufficient notice that Saundra was misusing guardianship funds.

### A. Opening of the Accounts

■ Atlantic is not liable to Stacie for allowing Saundra to deposit the $29,331.72 check from Verizon in her personal accounts. The check from Verizon was made payable to Saundra. Saundra, not Stacie, was Atlantic's customer. Atlantic had no notice whatsoever that it was dealing with a guardian.

### B. Letter to the Orphans' Court

■ Saundra's request that Atlantic write a letter to the Orphans' Court also does not create liability under either legal principle. In the letter, Mascaro merely informed the Orphans' Court that Atlantic had set up the Share Certificate in Saundra's name with Stacie as the beneficiary. The term "beneficiary" in this context had nothing to do with the guardianship. It merely referred to the fact that if Saundra were to die before the Share Certificate became due, Stacie would receive the $12,000. While Saundra's request may have given Atlantic a hint that the Orphans' Court had some interest in the funds, Atlantic did not have the sort of knowledge that would create a duty under *Chicago Title*.

### C. Telephone Call by Zimmer

■ Zimmer's inquiry into Saundra's account added nothing to Atlantic's knowledge of the nature of the guardianship funds, and therefore cannot create liability. Zimmer merely asked Mascaro how the Share Certificate was titled, how it was

insured, and whether the title could be changed. This gave Atlantic no new information. Nothing in Zimmer's memorandum states that Zimmer informed Mascaro that the funds were restricted or even that they were part of a guardianship estate. Accordingly, Atlantic still owed no duty to Stacie to ensure that Saundra complied with the Orphans' Court's order.

### D. Meeting with Hobbs

■ Even after Mascaro's meeting with Hobbs, Atlantic neither owed a duty to Stacie's guardianship nor acted in bad faith.[10] At their meeting, Hobbs told Mascaro that he was the substitute guardian for Stacie's estate and that he wished to withdraw the funds from the Share Certificate. Hobbs provided Mascaro with a copy of the order appointing him guardian. The order, however, merely removed Saundra as guardian and appointed Hobbs in her place. The document did not establish that the funds that Saundra had deposited in her accounts were guardianship funds.

Atlantic's actions after Mascaro's meeting with Hobbs are plainly distinguishable from those of the bank in *Chicago Title*. The bank in *Chicago Title* violated accepted banking practices by signing away a check that was payable to the bank without investigating the plaintiff drawer's intentions. *See Chicago Title*, 905 A.2d at 383. The bank also had reason to know what the plaintiff intended the bank to do with the check. *Id.*

■ Atlantic, on the other hand, complied with customary banking practices and its legal obligations by treating the funds in Saundra's accounts as her personal funds. The check was made payable to Saundra, not Stacie. In addition, Atlantic

---

10. By this point, Saundra had withdrawn all of the funds that were in her money market account but had not yet begun to withdraw anything from the Share Certificate.

had no documentation that proved that the funds were part of Stacie's estate. Without an order from the Orphans' Court, or at a minimum a copy of the Orphans' Court's original order, which deemed the funds from the Verizon benefits plan guardianship funds, Atlantic could not legally turn the funds over to Hobbs. Atlantic could have filed an interpleader action or petitioned the Orphans' Court for guidance. Perhaps either action would have been prudent, but neither was legally required.

Moreover, it was the responsibility of Hobbs, as substitute guardian, to take appropriate action. Hobbs had an eight-month period during which he could have preserved the funds by petitioning the Orphans' Court for an order directing Atlantic to turn the funds over to him. He took no such action, however. Hobbs, not Atlantic, must bear the responsibility for the loss of the funds.[11]

At no point did Atlantic have a duty to Stacie's guardianship, and at no point did Atlantic act in bad faith in dealing with Saundra. Accordingly, Atlantic cannot be liable to Stacie and, by extension, National Grange.

## V.   Conclusion

For the reasons stated above, the Court will, by separate order, DENY National Grange's Motion for Summary Judgment and GRANT Atlantic's Motion for Summary Judgment.

### *ORDER*

Now pending are (i) Plaintiff National Grange Mutual Insurance Company's ("National Grange") motion for summary judgment against Defendant Atlantic Financial Federal Credit Union ("Atlantic"), and (ii) Atlantic's motion for summary

judgment against National Grange. For the reasons stated in the memorandum opinion of even date, the Court hereby:

(i) DENIES National Grange's motion (Docket No. 34);

(ii) GRANTS Atlantic's motion (Docket No. 35); and

(iii) DIRECTS the parties to file a joint status report on or before April 18, 2008, addressing the following issues, and any other issues counsel believe should be discussed:

1. Atlantic's counter-claims for indemnity against Verizon and Saundra appear to be moot. Does Atlantic intend to dismiss those claims?

2. Does National Grange intend to dismiss its claim against Verizon? It is so ORDERED this 27th day of March, 2008.

---

11. National Grange, as assignee, enjoys only those rights that Hobbs could have asserted against Atlantic.