905 A.2d 366

CHICAGO TITLE INSURANCE COMPANY, et al.

v.

ALLFIRST BANK, et al.

No. 80, Sept. Term, 2005.

Court of Appeals of Maryland.

Aug. 4, 2006.

Wayne T. Kosmerl (Michael S. Steadman, Jr., of Council, Baradel, Kosmerl & Nolan, P.A., Annapolis, MD) on brief, for Petitioners/Cross–Respondents.

Dennis P. McGlone (Brian L. Moffet of Gordon, Feinblatt, Rothman, Hoffberger & Hollander, L.L.C., Baltimore, MD, C. Edward Hartman, III, of Hartman and Egeli, L.L.P., Annapolis, MD), on brief, for Respondents/Cross–Petitioners.

C. Dawn Causey, Esq., Gregory F. Taylor, Esq., American Bankers Association, Washington, D.C., for amici curiae Brief of the American Bankers Association and Maryland Bankers Association as amici curiae in Support of Cross–Appeal of Famers Bank of Maryland.

Argued before BELL, C.J., and WILNER, CATHELL, HARRELL, BATTAGLIA, GREENE and JOHN C. ELDRIDGE (Retired, Specially Assigned), JJ.

GREENE, J.

In this case we must decide an issue of first impression, whether a depositary bank is liable in negligence to a non-customer drawer of a check. The parties and their respective roles, in this declaratory judgment action, are complex and will be detailed *infra*. For now, we note that the instant case originated with the refinancing of Mark A. Shannahan's home in 1997. Petitioner, First Equity, an agent for petitioner, Chicago Title Insurance Company, conducted Shannahan's settlement.[1] Shannahan granted an indemnity deed of trust ("IDOT") to Farmers Bank of Maryland, where he also maintained several business and personal accounts.

---

1. We shall refer to Chicago Title and First Equity collectively as "First Equity."

While several checks exchanged hands in order to complete Shannahan's refinancing, the two checks at issue here were Check No. 1 and Check No. 2. Check No. 1 was delivered and made payable to Shannahan by First Equity to represent his "cash out" from the refinancing. Check No. 2 was made payable to Farmers Bank, and drawn on First Equity's checking account at Allfirst Bank, representing payment for an outstanding line of credit. Both checks were delivered to Shannahan, along with a letter instructing Farmers Bank to pay off and close out the line of credit. The letter was never delivered to Farmers Bank, and both checks were indorsed and deposited by Shannahan into his personal account. Eventually, Farmers Bank initiated foreclosure proceedings in connection with the IDOT because the line of credit balance was in default. Apparently, this occurred when First Equity became aware that Farmers Bank still had a lien on Shannahan's property, and that Shannahan did not pay off the line of credit. When First Equity notified Allfirst about Check No. 2, it requested that Allfirst re-credit its account, which Allfirst refused.

First Equity filed a declaratory judgment action against Farmers Bank and Allfirst in the Circuit Court for Anne Arundel County, to which both Farmers and Allfirst banks filed a Counter–Complaint for Interpleader against First Equity. The Circuit Court subsequently ordered Farmers Bank to release the IDOT lien on the property. It was also determined that Allfirst was not liable for debiting funds from First Equity's checking account through the processing of Check No. 2. First Equity filed a cross-appeal on that issue. The Court of Special Appeals affirmed the judgment of the Circuit Court. *Farmers Bank of Maryland v. Chicago Title Ins. Co.*, 163 Md.App. 158, 877 A.2d 1145 (2005). Chicago Title and First Equity filed a Petition for Writ of Certiorari, and Farmers Bank filed a Cross–Petition for Writ of Certiorari, both of which we granted. *Chicago Title v. Allfirst*, 389 Md. 398, 885 A.2d 823 (2005).

First Equity presents two questions for our review, which we have rephrased: [2]

1. Did the Court of Special Appeals err in its holding that Check No. 2 was properly payable?

2. Did the intermediate appellate court err in concluding that an action in negligence against Farmers Bank was permitted under Maryland law?

We answer both questions in the negative and affirm the judgment of the Court of Special Appeals. Farmers Bank and Allfirst also presented three issues for our review,[3] which are addressed *infra.*

## FACTS

On October 27, 2000, the parties filed a Stipulation to Certain Facts, in addition to a Stipulation to Authenticity and Admissibility of Documents. We set forth the salient portions of the stipulated facts:

---

**2.** First Equity's original questions presented were:
  1. Did the Court of Special Appeals err in its holding that Farmers' [depositary] bank indorsement on Check No. 2 also constituted a *payee* indorsements by Farmers on Check No. 2?
  2. Did the Court of Special Appeals err in its holding the loss incurred by First Equity was caused by "events occurring outside the check itself," and that as such the loss-allocation rules of the UCC do not apply to this matter?

**3.** Farmers Bank and Allfirst ("respondents") are both represented by the same counsel and presented three issues that addressed both parties' positions:
  1. Whether, as a matter of Maryland law, Farmers, as the [depositary] bank, owed a tort duty of care to Chicago Title and First Equity, neither of which were customers of the bank nor had an intimate nexus with the bank?
  2. Whether a cause of action for common law negligence had been displaced by the statutory scheme of the Maryland Uniform Commercial Code as to actions by a drawer of a check against a [depositary] bank alleging improper negotiation of a check?
  3. Whether the lower courts correctly found that the Check bore the indorsement of the payee, was effectively negotiated to Allfirst, and was therefore properly paid by Allfirst?
  Respondents' questions will be addressed in our analysis below.

On November 25, 1997, [Shannahan] refinanced his home located at 735 Conley Drive, Annapolis, Maryland 21401, through Aramada Mortgage Corporation. First Equity ... conducted the settlement. A title examination ... revealed the existence of a mortgage in the original face amount of $110,000.00 granted by Shannahan unto and for the benefit of Chase Home Mortgage Corporation ... and recorded among the Land Records of Anne Arundel County[.] (DS–1) [4] Said property was also subject to an [IDOT] granted by Shannahan ... for the benefit of [Farmers] Bank ... in November 26, 1996, and recorded among the Land Records....

Prior to conducting the settlement, First Equity received from Armada Financial, two (2) payoff statements dated October 23, 1997, which had been completed by Judy O'Malley, Loan Assistant for [Farmers] Bank. One payoff statement indicated the existence of a loan dated November 21, 1996 in the original "high credit" amount of $50,000.00. (DS–3) The remaining balance as of October 23, 1997, was $45,104.47. On this payoff statement, Ms. O'Malley made the circled notation "2nd DOT" above the high credit amount of $50,000.00. A payoff statement was also furnished by Judy O'Malley, indicating the existence of another loan dated March 25, 1970, with a high credit amount of $40,000.00. On this statement, Ms. O'Malley made a circled notation "3rd DOT" above the high credit amount of $40,000.00. (DS–4). The balance reflected thereon was $40,760.83. This obligation was a line of credit, the balance of which can fluctuate from time to time. The current balance of this obligation is $59,699.98.

When comparing the title examination with the payoff statements, Shannon Eubanks, Vice President of First Equity, initiated an inquiry with the title examiner to determine the existence of the "3rd DOT." A review of the Land Records did not reveal the existence of a third deed of trust.

---

4. The notation "DS" refers to "Document Stipulation."

Following settlement, First Equity forwarded a check in the amount of $70,696.36 (DS–8) to pay off the refinanced Mellon Bank mortgage and forwarded to Farmers a check in the amount of $45,575.70 to pay off the $45,575.70 loan secured by the "2nd DOT." (DS–10) First Equity delivered to Shannahan a check in the amount of $87,764.11, made payable to Shannahan, which represented Shannahan's "cash out" from the refinance, as well as a check in the amount of $40,760.83 (DS–12).

On December 3, 1997, Shannahan went to Farmers' West Street branch and deposited the $87,464.11 check in [an] account . . . which he maintained in his individual name at Farmers. In addition, Shannahan deposited in this same account, Check 2 in the amount of $40,760.83, which was made payable to Farmers and drawn on First Equity's account at Allfirst. [ (DS–15) ]. Shannahan endorsed the check with his signature. [ (DS–12) ]. Two [i]ndorsements of Farmers Bank also appear on the back of the check.

When Shannahan attempted to deposit Check 2 to his account, the teller took the check to Bill Grippo, the bank manager of the Farmers' West Street branch, since the amount "was over her limit." Mr. Grippo called Mr. Shannahan into his office and saw that the check was made payable to Farmers. Mr. Grippo pulled up Shannahan's bank and loan accounts on his computer and saw that Farmers has a "trust on [his] Shannahan's property." Mr. Grippo then allegedly contacted Matt Pipkin, a loan officer at Farmers who was familiar with the loans extended by Farmers to Shannahan and his several corporations. (DS–25) Shannahan maintained several bank accounts with rather large balances at Farmers and, in addition, had at least four outstanding loans with Farmers. (DS–16, 17, 18, 19 and 20) According to Mr. Grippo, he advised Matt Pipken regarding the check, and Mr. Pipken indicated that it was "okay" for Shannahan to deposit Check 2 in Shannahan's account. According to Mr. Grippo, he "questioned the outstanding trusts" and Mr. Pipken indicated that is was okay to deposit the check [Check 2]. *See,* DS–25.

Mr. Pipken testified at his deposition that he was familiar with the contents of the Grippo memo dated June 30, 1998, but the statements made by Grippo that he had discussed the depositing of Check 2 with Pipken were false. Mr. Pipken did not remember ever being called and discussing the depositing of Check 2 into Shannahan's [account].... In late June/early July, Farmers initiated foreclosure action with regard to the IDOT, due to the fact that the $40,760.63 balance of the line of credit secured by the IDOT remained unpaid and delinquent. As a result of such foreclosure proceeding, First Equity became aware or the first time that Farmers had not applied Check 2 against the unpaid note. First Equity notified Allfirst about Check 2 and requested that the bank recredit its account. (DS–21) Allfirst refused to do so. The Armada Mortgage, which had been assigned to IMC Mortgage, was also in default and it desired to foreclose as well. An agreement was entered into between Chicago and Farmers, whereby Farmers agreed to subordinate its IDOT to that of IMC so that IMC could foreclos[e] upon the Shannahan property. The parties agreed that Chicago would file a complaint seeking declaratory and other relief in an attempt to resolve the dispute.

In finding for First Equity, the Circuit Court held that, notwithstanding Shannahan's possession of Check No. 2, the instrument was payable to Farmers Bank and not to the bearer. Thus, Shannahan was not a holder of the instrument and was unable to properly negotiate the check to the credit of his personal account. The Circuit Court treated Shannahan's indorsement as an "anomalous indorsement" pursuant to Md. Code (1975, 2002 Repl.Vol.) § 3–205(d) of the Commercial Law Article, and thus disregarded it and treated the check as if Shannahan had not attempted to negotiate it, noting that Farmers Bank had placed two indorsements on the back of the check while negotiating it to Allfirst. Thus, the Circuit Court held that Allfirst correctly dispersed the funds to Farmers Bank. Farmers Bank, however, permitted those funds, which were payable to itself, to be directed to Shannahan's account. Therefore, Farmers Bank accepted the check

from First Equity and then extended a payment to Shannahan in the same amount. Further, the court held that Farmers Bank negligently failed to apply the funds from Check No. 2 to Shannahan's outstanding balance on the line of credit, and that the delivery of Check No. 1 to Farmers Bank by mail, combined with the delivery of Check No. 2 to Shannahan, constituted a pay-off in full of the Farmers Bank IDOT. Therefore, the Circuit Court held that Farmers Bank was required to release the IDOT in accordance with the provisions of Md.Code (1974, 2003 Repl.Vol.) § 7–106 of the Real Property Article.

The case was then appealed to the Court of Special Appeals. The intermediate appellate court summarized the Circuit Court's additional findings:

> Allfirst correctly dispersed the funds to [Farmers] who then permitted these funds, intended for [Farmers], to be directed to Shannahan's account. Thus, [Farmers] did accept the check from First Equity in the amount of $40,760.83 and then extended a payment to Shannahan in the same amount. The court concludes that **[Farmers] negligently failed to apply the funds to Shannahan's outstanding balance of $40,760.83** on the line of credit also referred to in the payoff statement from Farmers as the 3rd DOT. The court finds that the delivery by First Equity of [Check 1] to [Farmers] by mail combined with the delivery by Shannahan of [Check 2] constitutes a pay-off in full of the Farmers IDOT and [Farmers] is required to release the IDOT in accordance with the provisions of Section 7–106 of the Real Property Article of the Code. (Emphasis added.)

*Farmers*, 163 Md.App. at 164–65, 877 A.2d at 1149. (Emphasis in original). The intermediate appellate court ultimately held:

> We shall sustain the trial court's ruling that Farmers [Bank] was negligent in its handling of Check [No.] 2. We hold that the court erred, however, in failing to consider the contributory negligence of First Equity, and in resting its decision on Md.Code (1974, 2003 Repl.Vol.), section 7–106 of the Real

Property Article ("RP")(authorizing [a] cause of action against [a] lienholder for its failure to release [a] lien whenever full payment is made and a release is requested in writing).[5] Finally, we affirm the trial court in its holding that First Equity could not recover against Allfirst because the latter did not violate UCC section 4–401 when it charged Check [No.] 2 against First Equity's account. This is so because no signature on Check [No.] 2 was forged, and no indorsement was missing.

*Farmers,* 163 Md.App. at 167, 877 A.2d at 1150. We shall discuss the reasoning of the Court of Special Appeals in support of its holding, as well as additional facts, in our analysis below.

## DISCUSSION

### I.

Did the Court of Special Appeals err in its holding that Check No. 2 was properly payable? [6]

First Equity argues that Check No. 2 was not properly payable when presented to Allfirst because Check No. 2 lacked the requisite *payee* indorsement from Farmers Bank, and that a missing indorsement is equivalent to a forged indorsement for purposes of determining whether a check is properly payable. Specifically, First Equity contends that the Court of Special Appeals erred in its determination that Farmers Bank indorsed Check No. 2 as a payee. Instead, First Equity asserts that Check No. 2 was not properly

---

5.  Neither First Equity, in its Petition for Writ of Certiorari, nor Farmers Bank, in its Cross–Petition for Writ of Certiorari, addressed the holding of the intermediate appellate court that § 7–106 of the Real Property Article did not permit Farmers' receipt of Check No. 2 to constitute payment of Shannahan's line of credit debt and to release the lien on his property. Therefore, the issue of the applicability of § 7–106 and whether Shannahan is entitled to a release of the lien on his property is not before us. *See* Md. Rule 8-131(b).

6.  We note that on February 24, 2006, Allfirst Bank withdrew its argument regarding Allfirst as a holder in due course as to Check No. 2.

payable under the Maryland UCC because it did not bear the necessary payee indorsement.

Prior to our discussion, we identify the roles of the parties as defined pursuant to the Maryland Uniform Commercial Code ("UCC"). Md.Code (1975, 2002 Repl.Vol.) §§ 1–101 *et seq.* of the Commercial Law Article. For example, Check No. 2 is both a negotiable instrument and a draft. Commercial Law § 3–104(a)–(f). First Equity signed, or was identified in, the draft as a "person" ordering payment; thus it is the drawer of the check. § 3–103(a)(3). Allfirst is the drawee, or person ordered in a draft to make payment, Section 3–103(a)(2), and is also the payor bank. § 4–105(3). Farmers Bank is a depositary bank pursuant to Commercial Law § 4–105(2), as it was "the first bank to take an item even though it is also the payor bank unless the item is presented for immediate payment over the counter." [7]

### Indorsement of Check No. 2

■ First Equity argues that Farmers Bank did not indorse Check No. 2 as its payee. Farmers Bank was the designated payee on Check No. 2, issued by First Equity and made payable "to the order of" Farmers Bank. It is undisputed by First Equity that Farmers Bank deposited Check No. 2 directly into Shannahan's private account. First Equity contends, however, that Farmers Bank's indorsement on Check No. 2 is a **depositary bank** indorsement, placed on Check No. 2 after Shannahan deposited it into his private account with Farmers Bank, and after it had been sent by the bank to a "processing department" outside the Annapolis Branch of Farmers Bank.

---

7. We note, as did the intermediate appellate court, Official Comment 1 to § 4–105:

> The definitions in general exclude a bank to which an item is issued, as this bank does not take by transfer except in the particular case covered in which the item is issued to a payee for collection, as in the case in which a corporation is transferring balances from one account to another. Thus, the definition of "depositary bank" does not include the bank to which a check is made payable if a check is given in payment of a mortgage. This bank has the status of a payee[.]

First Equity argues that Farmers Bank's indorsement of Check No. 2 was intended to be that of a depositary bank, and urges us to evaluate the location of the physical characteristics of the Farmers Bank indorsement in relation to the deposit of that instrument into Shannahan's personal account, and its temporal and physical relationship with Shannahan's signature on Check No. 2. First Equity discounts the intermediate appellate court's notation that petitioners had not provided any expert testimony or otherwise that Farmers Bank's indorsement on Check No. 2 "could not serve the dual purpose of a [depositary] bank indorsement and a payee indorsement." *Farmers,* 163 Md.App. at 191, 877 A.2d at 1164.

First Equity contends that Farmers Bank's signature on Check No. 2, by its placement on the instrument in "full compliance with C.F.R. 12 guidelines," and its temporal and spatial relationship to Shannahan's signature in the location "long established" by custom and usage as that of the payee, clearly indicates that Farmers Bank did not intend to provide a payee's indorsement on Check No. 2.

Farmers Bank and Allfirst note that Check No. 2 clearly bears four indorsements, one by Shannahan, two by Farmers Bank and one by Allfirst.[8] The intermediate appellate court noted that the pattern of the indorsements placed by Farmers Bank on Check No. 2 is the same as that placed on the other check that was payable to Farmers Bank. *Farmers,* 163 Md.App. at 191, 877 A.2d at 1164.

An indorsement is defined by Md.Code (1975, 2002 Repl.Vol. & 2005 Supp.) § 3–204(a) of the Commercial Law Article:

(a) "Indorsement" means a signature, other than that of a signer as maker, drawer, or acceptor, that alone or accompanied by other words is made on an instrument for the purpose of (i) negotiating the instrument, (ii) restricting payment of the instrument, or (iii) incurring indorser's liability on the instrument, **but regardless of the intent of the signer, a signature and its accompanying words is an**

---

8. Allfirst was known at that time as First National Bank or "FNB."

indorsement unless the accompanying words, terms of the instrument, place of the signature, or other circumstances unambiguously indicate that the signature was made for a purpose other than indorsement. For the purpose of determining whether a signature is made on an instrument, a paper affixed to the instrument is a part of the instrument.

(Emphasis added). The Official Comment to § 3–204(a) provides some guidance to its application:

In some cases an indorsement may serve more than one purpose. For example, if the holder of a check deposits it to the holder's account in a depositary bank for collection and indorses the check by signing holder's name with the accompanying words "for deposit only" the purpose of the indorsement is both to negotiate the check to the depositary bank and to restrict payment of the check.

The but clause of the first sentence of subsection (a) elaborates on former Section 3–402. In some cases it may not be clear whether a signature was meant to be that of the indorser, a party to the instrument in some other capacity such as drawer, maker or acceptor, or a person who was not signing as a party. **The general rule is that a signature is an indorsement if the instrument does not indicate an unambiguous intent of the signer not to sign as an indorser. Intent may be determined by words accompanying the signature, the place of the signature, or other circumstances.**

(Emphasis added).

■ Although the "general rule" is worded in a manner that is somewhat unnecessarily obtuse, we attempt to simplify the rule. A signature on the back of an instrument is an indorsement unless it says that it is not. If the instrument does not indicate any clear intent on the part of the signer to sign as anything other than an indorser, the signature is an indorsement. In the instant case, the intermediate appellate court was correct in finding that Shannahan's signature repre-

sented an anomalous indorsement.[9]  Shannahan was not a "holder" [10] of the instrument;  therefore his signature on the back of the instrument did not affect the manner in which it could be negotiated.

The only indorsement (other than Allfirst's subsequent indorsement as the payor bank) was that of Farmers Bank. We find no support for Farmers Bank's contention that it indorsed the back of Check No. 2 as a depositary bank and not as the payee of the instrument.  Farmers Bank states in its brief, "[t]here is no doubt that Farmers' indorsement of Check No. 2 *was intended to be,* and was, that of a [depositary] bank."  Petitioner's Brief at 21 (emphasis added).  Whether Farmers Bank intended its indorsement to be that of a depositary bank is irrelevant under the facts of the instant case and under the definition of indorsement set forth in § 3–204(a):  "[R]egardless of the intent of the signer, a signature . . . is an indorsement unless the accompanying words, terms of the instrument, place of the signature, or other circumstances unambiguously indicate that the signature was made for a purpose other than indorsement."

An examination of Check No. 2 indicates that there were no accompanying words with the stamp of Farmers Bank to indicate that the indorsement was that of a depositary bank *only,* or that the stamp was not intended to be an indorsement.  Farmers Bank directs us to Official Comment 1 to § 3–204, which suggests that custom and usage may be used

9. *See* Md.Code (1975, 2002 Repl.Vol.) § 3–205(d) of the Commercial Law Article (" 'Anomalous indorsement' means an indorsement made by a person who is not the holder of the instrument . . . and does not affect the manner in which the instrument may be negotiated.").

10. Section 1–201(20)(a) of the Commercial Law Article defines a "holder" in regards to a negotiable instrument as follows:

(20) "Holder" means:

(a) The person in possession of a negotiable instrument that is payable either to bearer or to an identified person that is the person in possession;

Check No. 2 is a negotiable instrument but was not payable to either "bearer" or Shannahan, who was the person in possession of the check. Therefore, Shannahan was not a "holder" of the check.

as a factor to determine intent, and contends that Farmers Bank's indorsement, "and its temporal and physical relationship with Shannhan's signature," demonstrate that it was solely that of a depositary bank. We acknowledge that specifications are provided by the Code of Federal Regulations for the location of the stamp of a depositary bank. The fact that Farmers Bank's indorsement falls within those enumerated specifications does not negate the facts that Farmers Bank is the payee of the instrument; that the only other indorsement on the instrument is an anomalous indorsement; and that there is no accompanying information with its stamp to indicate that it is a depositary bank indorsement *only*. Maryland law provides that an indorsement can be written anywhere on an instrument. *Leahy v. McManus*, 237 Md. 450, 454, 206 A.2d 688, 690 (1965). The fact that Farmers Bank's stamp on Check No. 2 was *identical* to that of its stamp on Check No. 1, where it was the payee, flies in the face of its contention that its stamp on Check No. 2 was *unambiguously* that of a depositary bank.

Farmers Bank has not presented any expert testimony to support its contentions. Further, there was testimony from an experienced bank officer that stamped bank indorsements could appear anywhere on back of check. The words, or lack thereof, accompanying Farmers Bank's indorsement, the place of the stamp, and other circumstances surrounding Check No. 2 *do not* indicate a clear intent on the part of Farmers Bank *not to sign* as an indorser.

## II.

Did the intermediate appellate court err in concluding that an action in negligence against Farmers Bank was permitted under Maryland law?

Farmers Bank and Allfirst argue that the Court of Special Appeals erred in recognizing the existence of a common law tort duty owed by a depositary bank to a non-customer.[11]

---

11. We disagree with Allfirst's contention that our decision in *Messing v. Bank of America, N.A.*, 373 Md. 672, 821 A.2d 22 (2003) stands for the

Farmers Bank notes that no contractual duty existed between First Equity and Farmers Bank, as First Equity was not a customer of Farmers Bank. In addition, First Equity did not maintain an account with Farmers Bank and had no contractual or direct relationship with Farmers Bank. In regard to a common law duty of care, Farmers Bank's claim that the facts of the instant case are legally inadequate to impose a duty of care owed by Farmers Bank to First Equity. We must first discuss, however, the argument that Md.Code (1975, 2002 Repl.Vol. & 2005 Supp.) § 3–420 of the Commercial Law Article expressly rejects the position that a depositary bank such as Farmers owes a duty to exercise reasonable care to

proposition that a depositary bank has no duty to someone in Chicago Title's position as a "non-customer and a stranger to the Bank." *Id.* at 691, 821 A.2d at 33. In *Messing*, the petitioner took issue with the Bank of America's Thumbprint Signature Program, "where the bank requests non-customer presenters of checks over the counter to place an 'inkless' thumbprint or fingerprint on the face of the check as part of the identification process." *Id.* at 679, 821 A.2d at 25–26. Petitioner elected to present the check for payment at a branch of the drawer's bank, and the check went as far as being placed into the teller's computer's printer slot which stamped certain data on the back of the check. *Id.* at 680, 821 A.2d at 26. After endorsing the check, the teller asked for petitioner's identification, and wrote that information on the back of the check. *Id.* At some point in the transaction, the teller ascertained that the petitioner was not a customer of Bank of America, and informed him that his thumbprint would be necessary to complete the transaction. *Id.* at 681, 821 A.2d at 26. Petitioner refused, and after taking up the matter with the bank manager, was turned away. *Id.* at 681, 821 A.2d at 27.

Petitioner argued, *inter alia*, that the check had been properly presented to Bank of America and thus, it was improper for the bank to refuse to pay the check. In our rejection of petitioner's point of view, we noted that, "[r]eceipt of a check does not ... give the recipient a right against the bank. The recipient may present the check, but if the drawee bank refuses to honor it, the recipient has no recourse against the drawee." *Id.* at 691, 821 A.2d at 33. In support of this, we stated, "Absent a special relationship, a non-customer has no claim against a bank for refusing to honor a presented check." *Id.* at 692, 821 A.2d at 33 (citing *City Check Cashing, Inc. v. Manufacturers Hanover Trust Co.,* 166 N.J. 49, 764 A.2d 411, 417 (2001)). As we shall discuss, unlike the non-customer in *Messing*, the facts of the instant case do not demonstrate a " 'transient, non-contractual relationship,' " insufficient to establish a duty, on the part of Farmers Bank. *See id.*

non-customer drawers of checks that are presented for deposit.

### Section 3–420   of the Commercial Law Article

█  Both the respondents and The American Banker Association, as *amici*, argue that § 3–420 of the UCC displaces the common law causes of action against a depositary bank by the drawer of a check.   Section 3–420 provides in pertinent part:

(a) The law applicable to conversion of personal property applies to instruments.   An instrument is also converted if it is taken by transfer, other than a negotiation, from a person not entitled to enforce the instrument or a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment. An action for conversion of an instrument may not be brought by (i) the issuer or acceptor of the instrument or (ii) a payee or indorsee who did not receive delivery of the instrument either directly or through delivery to an agent or a co-payee.

(b) In an action under subsection (a), the measure of liability is presumed to be the amount payable on the instrument, but recovery may not exceed the amount of the plaintiff's interest in the instrument.

(c) A representative, other than a depositary bank, who has in good faith dealt with an instrument or its proceeds on behalf of one who was not the person entitled to enforce the instrument is not liable in conversion to that person beyond the amount of any proceeds that it has not paid out.

We disagree with *amici* and the respondents that our decision in the instant case implicates *Hartford Fire Ins. Co. v. Maryland Nat'l Bank, N.A.*, 341 Md. 408, 671 A.2d 22 (1996), and the subsequent amendment of § 3–420 of the UCC abolishing a drawer's common law action for conversion.   The facts of the instant case are distinguishable in that the drawer in the instant case does not have an adequate remedy under the UCC because payment of the check was authorized pursuant to the guidelines of the UCC.[12]

─────────

12.  The Official Comment 1 to § 3–420 provides:

Section 1–103 of the UCC provides that, unless displaced by Titles 1 through 10 of the Commercial Law Article, "the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions." [13] The plain language of the statute states that actions in conversion are prohibited in specific situations. We disagree with the reading of the statute by *amici*. In our view, to conclude that the prohibition of one tort action by the UCC means the prohibition of *all* tort actions is unsupported by Maryland law. To allow a negligence action to proceed in the instant case, where Check No. 2 was properly payable, is not error.

Section 4–401(a) of the Commercial Law Article provides that "[a] bank may charge against the account of a customer an item that is properly payable from that account. . . . [A]ny item is properly payable if it is authorized by the customer and is in accordance with any agreement between the customer and bank." As we have discussed *supra*, there were no missing or unauthorized indorsements on Check No. 2. Farmers Bank's stamp constituted a proper indorsement of the check. The check was payable to Farmers Bank *only*, and

---

Under former Title 3, the cases were divided on the issue of whether the drawer of a check with a forged indorsement can assert rights against a depositary bank that took the check. The last sentence of Section 3–420(a) resolves the conflict by following the rule stated in [*Stone & Webster Engineering Corp. v. First National Bank & Trust Co.,*] 345 Mass. 1, 184 N.E.2d 358 (1962). There is no reason why a drawer should have an action in conversion. The check represents an obligation of the drawer rather than property of the drawer. **The drawer has an adequate remedy against the payor bank for recredit of the drawer's account for unauthorized payment of the check.** (Emphasis added). Our treatment of *Stone* in *Hartford Fire Ins. Co., supra,* is inapplicable to the instant case as we have found that Check No. 2 was not unauthorized and was, in fact, properly payable.

**13.** The exceptions to this statement are: "(a) the age of majority as it pertains to the capacity to contract is eighteen years of age; and (b) no person who has attained the age of eighteen years shall be considered to be without capacity by reason of age." Md.Code (1975, 2002 Repl.Vol. & 2005 Supp.) § 1–103(a)–(b) of the Commercial Law Article.

there is no evidence on the record that Shannahan's signature constituted a forgery.[14] The loss in the instant case was indeed caused by events that occurred outside of the check itself, and therefore the UCC loss allocation rules do not apply to First Equity's claim.[15] We look instead to the rules of common law negligence.

## Negligence

We turn now to determine whether Farmers Bank may be held liable to First Equity in negligence for its handling of Check No. 2, notwithstanding the fact that First Equity was not a customer of Farmers Bank, and there was no formal contract between the parties. As we shall discuss, Maryland law provides that a contractual relationship, *or its equivalent,* may establish the necessary "intimate nexus" between the parties in a tort action where only economic loss results. *See Jacques v. First Nat'l Bank,* 307 Md. 527, 534–35, 515 A.2d 756, 759–60 (1986). The elements of negligence are well-established and require a plaintiff to assert in the complaint the following: "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty." *Valentine v. On*

---

14. The UCC does not define "forgery," but "forgery is equated with the concept of 'unauthorized' signatures or indorsements, as defined in § 1–201(43). A forged indorsements, in other words, under the law of Maryland and elsewhere, is one that is 'unauthorized' within the meaning of § 1–201(43)." *Northwestern Nat'l Life Ins. Co. v. Laurel Fed. Sav. Bank,* 979 F.Supp. 354, 356 (D.Md.1996) (citing *Citizens Bank of Maryland v. Maryland Indus. Finishing Co., Inc.,* 338 Md. 448, 458, 659 A.2d 313, 318 (1995)). Section 1–201(43) of the Commercial Law Article defines an unauthorized signature as "one made without actual, implied, or apparent authority and includes a forgery." Shannahan did not attempt to indorse the instrument as "Farmers Bank," nor is there any evidence as to what type of authority he purported to have while signing the check. As we have already discussed, Shannahan's signature was more fittingly an anomalous signature per § 3–205(d) of the Commercial Law Article.

15. Thus, the Circuit Court was correct in concluding that First Equity had no cause of action against Allfirst.

*Target, Inc.,* 353 Md. 544, 549, 727 A.2d 947, 949 (1999) (quoting *B G & E v. Lane,* 338 Md. 34, 43, 656 A.2d 307, 311 (1995) (citation omitted)). One of our primary concerns in the instant case is the element of duty:

> The duty to take precautions against the negligence of others thus becomes merely a matter of the customary process of multiplying the probability that such negligence will occur by the magnitude of the harm likely to result if it does, and weighing the result against the burden upon the defendant of exercising such care.

*Hogge v. SS Yorkmar,* 434 F.Supp. 715, 729 (D.Md.1977) (citation omitted). We must consider two elements when resolving whether a tort duty should be recognized based upon a particular set of facts:

> "the nature of the harm likely to result from a failure to exercise due care, and the relationship that exists between the parties. Where the failure to exercise due care creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability. This intimate nexus is satisfied by contractual privity or its equivalent. By contrast, where the risk created is one of personal injury, no such direct relationship need be shown, and the principal determinant of duty becomes foreseeability."

*Noble v. Bruce,* 349 Md. 730, 739–40, 709 A.2d 1264, 1269 (1998) (quoting *Jacques,* 307 Md. at 534–35, 515 A.2d at 759–60). Absent a breach of duty, there is no liability in negligence. *Wells v. General Elec. Co.,* 807 F.Supp. 1202, 1204 (D.Md.1992).

We begin by acknowledging Chief Judge Bell's comprehensive analysis of the elements of duty and privity in *Walpert, Smullian & Blumenthal, P.A. v. Katz,* 361 Md. 645, 762 A.2d 582 (2000),[16] and our decision in *Jacques v. First Nat'l Bank of*

---

16. We disagree with Farmers Bank's contention that the Court of Special Appeals interpreted our decision in *Walpert, supra,* to mean that an "intimate nexus" is no longer required for the imposition of a duty where the failure to exercise due care results in economic loss only. In

*Maryland,* 307 Md. 527, 515 A.2d 756 (1986).[17] Both cases discuss the concepts of duty and privity at great length. We have no desire to reinvent the wheel. Therefore, we discuss the analyses of those cases relevant to the facts of the instant case.

*Walpert* involved the liability of an accountant for economic losses of a party who relied on a financial report which an accountant prepared. George and Shirley Katz (the "Katzses") sued Walpert, Smullian & Blumenthal, P.A. ("WS & B") in damages for negligence, gross negligence, negligent misrepresentation and breach of contract as a consequence of loans they made to Magnetics, Inc., George Katz's former company and WS & B's client. *Walpert,* 361 Md. at 648, 762 A.2d at 583. We affirmed the holding of the Court of Special Appeals in *Walpert* that an accountant's knowledge of a third-party's reliance on the accountant's work product was the legal equivalent of privity necessary to establish an accounting malprac-

---

support of this argument, respondents direct us to the following language in the decision of the intermediate appellate court:

> In sum, what we distill from *Walpert's* interpretation of *Jacques* and the New York cases is that the nexus requirement may not be as close as the word "intimate" would suggest, and to determine whether it is met, we must focus on the defendant's knowledge. Applying this lesson, we conclude that Farmers had a sufficient nexus to First Equity to justify imposition of a tort duty to handle Check [No.] 2 with ordinary care.

*Farmers,* 163 Md.App. at 177–78, 877 A.2d at 1156. We do not read this statement of the intermediate appellate court to mean that an intimate nexus is no longer required. Rather, the Court of Special Appeals opined on the degree of intimacy required to establish a duty in a situation in which only economic loss occurs in light of our decision in *Walpert.* We do not agree with the intermediate appellate court's contention that the intimacy of the nexus required to establish duty is somewhat relaxed in light of our decision in *Walpert.* Nonetheless, as explained *infra,* we find that a sufficient intimate nexus existed in the instant case to establish a cause of action in negligence.

17. In *Jacques,* individuals who were buying a home brought suit against the bank at which they applied for a home mortgage loan. *Id.* at 528, 515 A.2d at 756. We were called upon to determine whether a bank that has agreed to process an application for a loan owes a duty of reasonable care to its customer in the processing and determination of that application. *Id.*

tice claim. *Id.* at 653, 762 A.2d at 586. In discussing the element of duty, we noted our analysis in *Jacques v. First Nat'l Bank of Maryland:*

> This Court extensively considered the duty element of negligence in *Jacques. See id.* at 532–37, 515 A.2d at 759–61. In that case, the issue was whether a bank that had agreed to process a loan application owed its customer a duty of care in the processing of that application. Duty, 'an obligation to which the law will give effect and recognition to conform to a particular standard of conduct toward another,' *id.* at 532, 515 A.2d at 758, citing J. Dooley, *Modern Tort Law*, § 3.03 at 18–19 (1982, 1985 Cum.Supp.), we said, 'has been defined as the expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection.' *Id.* at 533, 515 A.2d at 759, *quoting Prosser and Keeton on The Law of Torts*, § 53 at 357 (1984). The Court also acknowledged two major considerations affecting duty: the nature of the harm likely to result from a failure to exercise due care, and the relationship that exists between the parties. *See id.* at 534, 515 A.2d at 759. With regard to the connection between the harm and the relationship between the parties, we observed:
>
> 'Where the failure to exercise due care creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability. This intimate nexus is satisfied by contractual privity or its equivalent. By contrast, where the risk created is one of personal injury, no such direct relationship need be shown, and the principal determinant of duty becomes foreseeability.' 307 Md. at 534–35, 515 A.2d at 759–60.

*Id.* at 657–58, 762 A.2d 582, 762 A.2d at 588–89 (quoting *Jacques*, 307 Md. at 532–33, 515 A.2d at 758–59). To illustrate the concept of the intimate nexus, it was necessary to note our reliance in *Jacques* upon two decisions from New York: *Ultramares Corporation v. Touche*, 255 N.Y. 170, 174 N.E. 441 (1931)[18] and *Glanzer v. Shepard*, 233 N.Y. 236, 135 N.E. 275

---

**18.** In *Ultramares,* the plaintiff sued for damages sustained as a result of misrepresentations of a firm of public accountants. *Id.* at 442. The

(1922).[19]   Our review of Maryland and New York case law led us to state in *Walpert* that "the rationale underlying the requirement of privity or its equivalent as a condition of liability for negligent conduct, including negligent misrepresentations, resulting in economic damages . . . [is] to avoid 'liability in an indeterminate amount for an indeterminate time to an indeterminate class.'" *Walpert*, 361 Md. at 671, 762 A.2d at 596 (quoting *Ultramares*, 174 N.E. at 444).   We explained that the reason for the privity requirement is to "limit the defendant's risk exposure to an actually foreseeable extent," allowing a defendant to control the risk to which he or she is exposed.   *Id.* In support of this statement, we cited the facts of *Jacques*, where the Jacqueses were not strangers to the loan transaction as the bank in that case promised the Jacqueses to process their loan application as a specific locked-in interest rate for a specific period of time.   *Id.* (citing *Jacques*, 307 Md. at 537, 515 A.2d at 761).   Then, citing *Glanzer*, Chief Judge Bell, writing for the Court, stated that

accountants were employed by Fred Stern & Co. to prepare and certify a balance sheet exhibiting the condition of its business. *Id.* The business required extensive credit and borrowed large sums of money from banks and other lenders in order to operate. *Id.* The defendants were aware of this fact, and provided numerous certified copies of the balance sheet to the company, although it was not aware that a copy would be given to the plaintiffs. *Id.* at 442. The status of the company, contrary to what was stated in the balance sheet, was insolvent, due to the falsification of the books by those in charge of the business. *Id.* The plaintiffs loaned money to the company on the basis of the balance sheet and brought suit against the accountants to recover the loss suffered by the plaintiff in reliance upon the audit. *Id.* at 443.

19. The plaintiffs in *Glanzer* bought beans from a merchant, the price of which was determined by the weight of the beans. *Glanzer*, 135 N.E. at 275. The buyers were given a certificate noting the certified weight of the beans that was prepared by "public weighers" who, at the seller's request, weighed the bags. *Id.* at 275–76. When the purchasers learned that the actual weight was less than that amount specified in the certified weight sheet, the purchasers sued the public weighers. *Id.* Despite the fact that the plaintiffs had no contract with the weigher of beans, the court held that the purchasers were the "known and intended beneficiaries" of the contract between the seller and the weigher, and the purchasers were beneficiaries of the duty owed by the weigher. *Id.*

"a defendant's knowledge of a third party's reliance on the defendant's action may be important in the determination of whether that defendant owes that party a duty of care." *Id.* at 684, 762 A.2d at 603. The identity of the plaintiffs in *Glanzer*, and the class in which those plaintiffs belonged, was known by the defendant, as was the fact that the prospective plaintiffs would be relying on the information provided by the defendant. *Id.* at 687, 762 A.2d at 605.

*Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d 110, 118 (1985),[20] subsequently clarified *Ultramares, supra,* in regard to the privity equivalent, or near privity requirement. The court in *Credit Alliance* determined that a plaintiff must establish:

(1) the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the accountants linking to that party or parties, which evinces the accountants' understanding of that party or parties' reliance.

*Id.* We noted in *Walpert:*

The policy objective underlying the *Ultramares'* approach is the same policy reflected in our cases involving negligence claims brought by third parties not in contractual privity with the defendant, limiting the unpredictable and unlimited nature of economic damages. See *Ultramares,*[ ]255 N.Y. at 179, 174 N.E. at 444 (explaining the holding, Judge Cardozo wrote that if third parties were allowed to recover from an

---

**20.** In the two appeals involved in *Credit Alliance,* the plaintiff loaned money to an accountant's client in reliance on audited financial statements prepared by the accountants. The Court of Appeals of New York held that the plaintiffs failed to allege sufficient facts to demonstrate the existence of a relationship between the parties that amounted to privity. *Credit Alliance,* 493 N.Y.S.2d 435, 483 N.E.2d at 119. Specifically, the court found that there was no sufficient allegation of "either a particular purpose for the reports' preparation or the prerequisite conduct on the part of the accountants ... [and] there is simply no allegation of any ... action on the part of [the accountants] directed to plaintiffs ... which provided the necessary link between them." *Id.* at 119.

accountant for negligence, "a thoughtless slip or blunder [would] expose accountants to liability in an indeterminate amount for an indeterminate time to an indeterminate class"). At the same time, this approach seeks to recognize and give effect to the current commercial reality in which the certified public accountant plays a major role in assuring the reliability of financial statements.

*Walpert,* 361 Md. at 675–76, 762 A.2d at 598–99 (footnotes omitted). We further stated that *Credit Alliance*

has clarified the ambiguity surrounding the nature of the relationship between the plaintiff and the defendant sufficient to constitute the required nexus that approaches privity under *Ultramares* and *Glanzer.* Clearly, it must be such that would allow the defendant to predict its liability exposure.

*Id.* at 690, 762 A.2d at 606. We turn now to the instant case.

### An Intimate Nexus

■ As the instant case presents a situation in which the failure to exercise due care creates a risk of economic loss only, we examine the relationship between Farmers Bank and Allfirst to determine if a sufficient intimate nexus between the parties existed, thus allowing the imposition of tort liability. Both Farmers Bank and Allfirst contend that Farmers Bank and First Equity were not in privity with one another, and that the only nexus between First Equity and Farmers Bank is that First Equity was the drawer of a check presented to Farmers Bank for deposit and collection. Allfirst further contends that such a connection is too attenuated to give rise to a duty of care owed by Farmers Bank to First Equity.

Because Bill Grippo, the Farmers Bank representative who handled Check No. 2, could not be found, the only evidence of what occurred from his perspective is contained in a memo he wrote:

Mr. Shannahan went to the teller to deposit the check, the teller brought the check to me since it was over her limit. At that time I had Mr. Shannahan come into my office and I

saw that the check was payable to Farmers Bank. At that time I retrived [sic] his accounts and saw that the bank had a trust on his property. At that time I called Matt Pipkin and told him what I had. Matt stated it was okay for Mr. Shannahan to deposit the check[.] I questioned the outstanding trusts and again Matt stated it was okay to deposit the check.

It was my practice to review Mr. Shannahan's large deposit, as I did with any other customer. If I or Brenda Higdon had any questions, we usually contacted Matt as he was the primary officer on the account.

At deposition, Matt Pipkin denied ever having this conversation with Grippo.

We noted in *Walpert* that *Glanzer* "clearly recognizes that a defendant's knowledge of a third party's reliance on the defendant's action may be important in the determination of whether that defendant owes that party a duty of care." *Walpert*, 361 Md. at 684, 762 A.2d at 603. In the instant case, Farmers Bank was aware that the check presented by Shannahan was drawn on Allfirst Bank and, although endorsed by him, the check was not made payable to Shannahan. When asked at trial what a branch manager was supposed to do when receiving a check like Check No. 2, "payable to itself with no other restrictions or instructions," John Yaremchuk, president of Farmers Bank, responded that a bank officer or branch manager should make inquiries to the presenter on "how they wanted to use the funds" and should determine if the customer's request was reasonable. Despite Yaremchuk's testimony that "inquiries" should be made when a check like Check No. 2 is presented, the court ascertained that the only statement of the individual who handled the transaction with Shannahan, Bill Grippo, did not indicate that Shannahan was asked any questions.

As noted by the intermediate appellate court, Farmers Bank received a sizable check payable to itself from First Equity, an institution that was not indebted to it, and with no direction as to its purpose. Yaremchuk even testified that, in

his experience, it would have been advisable to contact First Equity when a check like Check No. 2 was received. But Yaremchuk did not testify, and indeed there is no proof in the record that Farmers ever contacted First Equity to inquire about the check.

Here, Farmers Bank was aware that the funds drawn on Check No. 2 were not payable to Shannahan, and yet placed them in his account. As a bank, Farmers was aware that Allfirst would pay Check No. 2 out of its funds. Farmers Bank was also aware that First Equity was a title company, and, through the receipt of Check No. 1 which was sent directly to Farmers Bank, was on notice that the necessary payments to remove the liens on Shannahan's property were being made. Farmers Bank acknowledges that Shannahan's line of credit was included with his other business and personal debts that were *all* secured by the IDOT. Certainly, if Farmers Bank was aware that First Equity was attempting to perfect its title in Shannahan's property through its receipt of Check No. 1, it would be reasonable to assume that Farmers Bank's knowledge of the refinancing process would make them aware that Check No. 2 represented a payment in connection with Shannahan's refinancing as well. This knowledge supports both the Circuit Court's and the intermediate appellate court's conclusions that the requisite intimate nexus was created between Farmers Bank and First Equity.[21]

---

**21.** In its analysis, the Court of Special Appeals relied upon *Sun 'n Sand, Inc. v. United*, 21 Cal.3d 671, 148 Cal.Rptr. 329, 582 P.2d 920, 936–37 (1978). While the intermediate appellate court found *Sun n' Sand* persuasive, we decline to apply the California case because it is inapposite. In *Sun 'n Sand*, a drawer claimed negligence on the part of a depositary bank that allowed a check that was payable to the bank to be deposited in the personal account of the check's presenter, the drawer's employee. An employee of Sun 'n Sand, Eloise Morales, prepared several checks for signature by a corporate officer as part of her employment for varying small amounts, payable to United California Bank ("UCB"), and obtained authorized signatures from a Sun 'n Sand officer who believed the sums represented debts that his company owed to UCB. *Sun 'n Sand*, 148 Cal.Rptr. 329, 582 P.2d at 926. There were no debts owed to UCB, however, and Morales subsequently altered the checks by increasing the amount, and then presented them to UCB. *Id.* Despite the fact that UCB was the named payee, it allowed the proceeds

We also note, as did the Court of Special Appeals, that the drawer of the check was a title company in the business of insuring against title defects, including the priority of a lender's lien on real property. Shannahan's outstanding loans were secured by real property. Also, Farmers Bank had received a "payoff request" from Armada, the new lender (to whom First Equity would issue a lender's title policy). Farmers Bank had replied to that request identifying its two secured loans and stating the amount due. Cumulatively, these factors suggest that Farmers Bank knew, or should have known, that there was a risk that First Equity was expecting the proceeds of the check to pay off the line of credit secured by the IDOT. This conduct on the part of Farmers Bank, taken into consideration with all the other circumstances surrounding the transaction, represents conduct on the part of Farmers Bank that links it to First Equity, and evinces Farmers Bank's understanding of First Equity's reliance.[22] Unlike the facts of *Ultramares*, our holding does not impose liability on Farmers Bank to an indeterminate class of

---

of the checks to be deposited into Morales's personal account at UCB. *Id.*

The Supreme Court of California held that the common law negligence cause of action was not superseded by the Commercial Code, noting that an attempt by a third party to "divert the proceeds of a check drawn payable to the order of a bank to the benefit of one other than the drawer or drawee suggests a possible misappropriation ... and UCB should have been alerted to the risk that Sun 'n Sand's employee was perpetrating a fraud." *Id.* at 694-695, 148 Cal.Rptr. 329, 582 P.2d 920.

It is important first to note that *Sun 'n Sand* is "expressly ... and narrowly—limited to the particular factual allegations then before the Supreme Court [of California]." *Lee Newman, M.D., Inc. v. Wells Fargo Bank*, 87 Cal.App.4th 73, 80, 104 Cal.Rptr.2d 310 (Cal.Ct.App.2001). Next, we find *Sun 'n Sand* distinguishable because it involves a check that was fraudulently altered. In the instant case, Check No. 2 was neither fraudulently altered nor indorsed and was "properly payable" under the UCC.

**22.** We do not agree with respondents' argument that a holding that an intimate nexus existed between Farmers Bank and First Equity would "lead to the result that a drawer of a check is always the equivalent of contractual privity with the depositary bank that receives the check." Our holding applies to the specific facts of the instant case.

people for an indeterminate time, but rather, addresses a specific entity, First Equity, for this specific transaction.

## Conclusion

■ An action for negligence, where the damages are only economic, may be brought by a non-customer drawer against a depositary bank, where there is no violation of the provisions of the UCC, and where duty is established by a sufficient intimate nexus between the depositary bank and the non-customer, through privity or its equivalent. We affirm the judgment of the intermediate appellate court, and in so doing, remand this matter to the Circuit Court to consider the defense of contributory negligence as it applies to Allfirst.[23] For the reasons stated *supra*, the trial court did not err in permitting a negligence claim against Farmers Bank in the instant case. We affirm the Circuit Court's denial of First Equity's claim against Allfirst, and the holdings of the intermediate appellate court.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE DIVIDED EQUALLY AMONG THE PARTIES.**

---

**23.** The intermediate appellate court did not err in remanding the matter for consideration of this issue. The record is clear that First Equity mailed Check No. 1 to Farmers Bank directly, and provided directions to Farmers Bank about how to handle the check. It clearly did not follow the same procedure in the mailing of Check No. 2 to Shannahan, choosing to entrust Shannahan, who was clearly not its agent, to deliver Check No. 2 and its accompanying documentation to Farmers Bank in order to properly perfect title to Shannahan's property. *See Kassama v. Magat*, 368 Md. 113, 127, 792 A.2d 1102, 1110 (2002) (quoting *Craig v. Greenbelt Consumer Services, Inc.*, 244 Md. 95, 97, 222 A.2d 836, 837 (1966)) (quoting Restatement (Second) of Torts § 463) ("'Contributory negligence is conduct on the part of the plaintiff which 'falls below the standard to which he should conform for his own protection, and which is a legally contributing cause co-operating with the negligence of the defendant in bringing about the plaintiff's harm.'"). Contributory negligence is ordinarily a question for the jury. *Kasten Const. Co. v. Evans*, 260 Md. 536, 541, 273 A.2d 90, 93 (1971) (citation omitted).